UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **EMERALD LAND CORP** | CASE NO. 6:17-CV-01655 |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| **TRIMONT ENERGY (BL) LLC ET AL** | MAGISTRATE JUDGE PEREZ-MONTES |

MEMORANDUM RULING

Presently before the Court is Chevron U.S.A. Inc.'s Motion for Partial Summary Judgment to Dismiss Private Claims for Removal of Buried Flowlines [ECF No. 239]. The motion is opposed by Plaintiff, Emerald Land Corporation ("Emerald"). For the reasons explained below, the motion is **GRANTED** in part and **DENIED** in part.

I.
FACTUAL BACKGROUND

Emerald is a Louisiana corporation based in St. Mary Parish, Louisiana, where it owns approximately 8,000 acres of land located along the Atchafalaya River immediately west of Morgan City. The tract includes over 6,000 acres of natural marsh land below the Intracoastal Waterway in the Atchafalaya Basin ("the Property").[1] The Property is within the Bateman Lake Field.[2]

---

[1] ECF Doc. 177, Ex. A at pp. 51:4–12; 53:7–16 (30(b)(6) Deposition of Emerald Land Corporation); Ex. B, Declaration of M. Taylor Darden at ¶ 3.
[2] ECF Doc. 177, Ex. B, Declartion of M. Taylor Darden at ¶ 5.

The Property has been the subject of three Mineral Leases ("the Mineral Leases") entered into by predecessors to Emerald and Defendants.[3] The Mineral Leases provided Defendants and Chevron's predecessor, Texaco, with the exclusive right to construct lines, tanks, storage facilities, buildings, stations and other structures necessary "to produce, save, take, care of treat and transport" oil and gas products on over 6,000 acres of Emerald's Property.[4] All three Mineral Leases contain an identical damages provision, requiring the lessees to pay for any damage to the Property: "Lessee shall pay all damages caused by its operations hereunder to the land, buildings and improvements presently existing, and crops now or hereafter planted."[5]

Chevron ultimately assigned its interest in the Mineral Leases and related contracts to EnerVest.[6] The interests in the Mineral Leases and related contracts changed hands multiple times thereafter.[7] Ultimately on May 5, 2020, Trimont Energy BL, the last remaining assignee of lessee interests under the Mineral Leases, "agreed that the Mineral Leases have terminated" and therefore released "all ... right, title and interest in and to the Mineral Leases."[8]

In the present motion, Chevron seeks partial summary judgment to dismiss the private claims asserted by Emerald for the removal of flowlines buried beneath the surface and canal bottoms of the Property.

---

[3] *Id.* at ¶ 6.
[4] Chevron and Texaco are referred to collectively as "Chevron." ECF Doc. 177, Ex. A at exhibits 3, 4, and 5, ¶ 1, attached thereto. (30(b)(6) Deposition of Emerald Land Corporation)
[5] ECF Doc. 177, Ex. A at pp. 85–88, referring to ¶ 13 of exhibits 3, 4, and 5 attached thereto. (30(b)(6) Deposition of Emerald Land Corporation)
[6] *See* Ex. B-2 to ECF No. 177, Act of Assignment from Texaco to EnerVest at p. 6; Ex. A at p. 116 (30(b)(6) Deposition of Emerald Land Corporation)
[7] *See* Ex. A to ECF No. 177, at pp. 94–95. (30(b)(6) Deposition of Emerald Land Corporation)
[8] *Id.* at p. 95, Exhibit 10 thereto (30(b)(6) Deposition of Emerald Land Corporation and Release of Mineral Leases)

## II.
### THE SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[9] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[11] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[12]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[13] "Credibility determinations are not part of the summary judgment analysis."[14] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

---

[9] Fed. R. Civ. P. 56(a).
[10] *Id.*
[11] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[12] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[13] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[14] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

existence of an element essential to that party's case, and on which that party will bear the burden of proof."[15]

## III.
## DISCUSSION

### A. The Scope of the Summary Judgment Motion.

Chevron seeks dismissal of Emerald Land's private claims pertaining to the removal of buried "flowlines" on the leased property. Emerald Land's complaint seeks specific performance and money damages with respect to the removal of flowlines. Relying on the terms of the Mineral Leases and the Louisiana Supreme Court's decision in *Terrebonne Parish School Board v. Castex Energy, Inc.*,[16] Chevron contends that it has no obligation to restore the leased land by removing all of the flowlines buried on the property. Specifically, the Mineral Leases include granting language that Chevron contends expressly grants it (or its predecessors) the right to install buried flowlines on the leased land in connection with its oil and gas exploration and production activities. Chevron also points out that the Mineral Leases contain no provision that expressly requires it to restore the land by removing buried flowlines or paying the cost for removing those flowlines. Chevron further argues that there is no evidence in the summary judgment record showing that the *buried* flowlines (as opposed to surface flowlines) have caused any damage to the leased land.

Emerald Land, on the other hand, distinguishes *Castex* and argues that, unlike the canals dredged on the leased property in *Castex*, the flowlines here are foreign equipment attached and buried on the property.[17] Accordingly, Emerald Land argues that Chevron has an obligation to remove the flowlines as part of its obligation to restore the land to its original condition minus the

---

[15] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).
[16] 893 So. 2d 789 (2005).
[17] ECF No. 264 at 3.

"wear and tear" attributable to "ordinary, customary, and necessary acts which must be done by a drilling company in order to put down a well."[18] Emerald Land also points to evidence in the summary judgment record showing flowlines exposed at the surface of the property, and presumably, creating hazards in the use of the property.[19] Emerald Land also points to evidence of leaks and other contamination from flowlines on the property.[20]

The record reflects at least two broad categories of flowlines at issue: flowlines buried at least "plow depth" below the surface ("buried flowlines"), and flowlines located on the surface of the property or less than plow depth ("surface flowlines"). For purposes of its motion, Chevron defines "plow depth" as at least three (3) feet below the surface. Chevron thus limits its Motion for Partial Summary Judgment to the private claims involving the removal of "buried flowlines"—flowlines at least three feet below the surface. Emerald Land's Opposition does not always distinguish between these types of flowlines and often refers to the buried flowlines and surface flowlines interchangeably. The Court, however, will analyze Chevron's motion as limited to buried flowlines.

### C. Buried Flowlines

Under the Louisiana Civil Code, a lessee is bound to "return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear."[21] A lessee also has a duty to avoid unreasonable or excessive use of the property during the term of the lease.[22] In *Castex*, however, the Louisiana Supreme Court held that "in the absence of an expressed lease provision, [the Mineral Code] does not impose or imply duty

---

[18] *Castex*, 893 So. 2d at 799 (quoting *Orhner v. Austral Oil Co.*, 104 So. 2d 253 (La. App. 3 Cir. 1958)).
[19] ECF No. 264 at 7-8.
[20] *Id.* at 9.
[21] La. C.C. Art. 2683 (3).
[22] *Alford v. Chevron U.S.A. Inc.*, 13 F. Supp. 3d 581, 600 (E.D. La 2014).

to restore the surface to it's original, pre-lease condition absent proof that the lessee has exercised his rights under the lease unreasonably or excessively."[23] According to the Court, a lessor in the context of an oil and gas lease "maybe considered to have a given his assent to the 'wear and tear' normally involved in rights granted" in a mineral lease.[24] There, the Court held that the plaintiff had no claim based on the canals that were dredged on the leased property because the right to dredge canals was explicitly granted in the lease and, therefore, was merely "wear and tear."[25] In *Marin v. Exxon Mobile Corp.*,[26] the Court clarified its ruling in *Castex*. According to *Marin*, a lessee has a duty to remediate oilfield contamination under the Louisiana Mineral Code's "prudent operator standard."[27] According to the *Marin* court, oilfield contamination does not constitute "wear and tear" because such contamination is not a matter that the lessors consented to in the lease.[28] The Court also noted that the oilfield contamination at issue in that case arose from the "unreasonabl[e] or excessive[]" use of the leased property[29]

    Here, Chevron argues that Emerald Land has no private claim requiring it to remove or pay to remove the buried flowlines because, like the canals in *Castex*, the Mineral Leases expressly grant Chevron and its predecessors the right to install flowlines buried under the surface. Considering the language of the Mineral Leases and the relevant case law, the Court agrees. The Mineral Leases expressly grant Chevron's predecessors the right to lay "pipelines" as well as tanks, stations, telephone lines, and "other structures thereon necessary to produce, save, take care of,

---

[23] 893 So. 2d. at 801.
[24] *Id.* at 800.
[25] *Id.* at 800-01.
[26] 48 So. 3d. 234 (2010).
[27] *Id.* at 259.
[28] *Id.* at 260.
[29] *Id.*

treat, and transport said products...."[30] Although the leases do not explicitly refer to flowlines, the term "pipelines" encompasses flowlines.[31] The Mineral Leases also expressly provide for the flowlines to be buried: "when required by lessor, lessee shall bury all pipelines below ordinary plow depths..."[32] Therefore, like *Castex*, Emerald Land (or its predecessors) consented to the installation of buried flowlines on the leased property.

Emerald Land first argues that *Castex* is distinguishable from the present case because, in *Castex*, the lessee had "altered the land itself by digging canals and ditches...."[33] In contrast, here, the buried flowlines are "foreign equipment to Emerald's Property" and "[t]he intrusion of this equipment onto the Property is not a 'modification' of the land."[34] Emerald Land's attempt to distinguish *Castex* is not persuasive for at least two reasons. First, installing buried flowlines underground is arguably a "modification" to the land because it changes or alters the land when the flowlines are installed even if they are buried.[35] Second, and more importantly, the *Castex* court's holding was not based on the nature of the modification—*i.e.* dredged canals versus buried flowlines. Instead, the court's holding was based on the meaning of "wear and tear" in the context of the Civil Code rule requiring a lessor to return leased property in its original condition minus "wear and tear."[36] The court construed wear and tear in terms of the "specific rights granted in the lease." According to the court: "The lessor may be considered to have given his assent to the 'wear

---

[30] Exhibits 3, 4, and 5 to the Deposition of Emerald Land Corporation through M. Taylor Darden, Exhibit A to Chevron's Motion for Partial Summary Judgment [ECF No. 239-4].
[31] Larry W. Lake, Ed., SPE PETROLEUM ENGINEERING HANDBOOK, Ch. 9, at 317 (2006) (defining "flowlines" as "piping and *pipeline* systems typically associated with producing wells ....") (emphasis added).
[32] *Id.*
[33] ECF No. 264 at 4.
[34] *Id.*
[35] *See, e.g.,* WEBSTERS THIRD NEW INTERNATIONAL DICTIONARY (1981) (defining "modification" as "the act or action of changing something without fundamentally altering it.")
[36] 893 So. 2d. at 800.

and tear' normally involved in exercising the rights granted."[37] The Mineral Leases here expressly grant Chevron (or its predecessors) the right to lay flowlines and, at the request of Emerald (or its predecessors), requires Chevron to bury the flowlines at ordinary plow depth. Thus, *Castex*'s holding applies here.

    Emerald Land next appears to argue that Chevron is taking inconsistent positions with respect to buried and surface flowlines. Specifically, the granting language in the Mineral Lease applies generally to flowlines without distinguishing between buried and surface flowlines. Yet, Chevron has agreed that the *surface* flowlines must be removed. In other words, according to Emerald Land, Chevron's position on surface flowlines is inconsistent with its argument that removal of the buried flowlines is not required under *Castex*: "[N]or [are buried flowlines] more 'necessary and incidental' to oil and gas operations than the surface equipment such as well heads and storage tanks Chevron agrees it must remove."[38] The Court disagrees. *Castex* is grounded on the lessee's consent to the "'wear and tear *normally involved* in exercising the rights granted.'"[39] Based on Emerald Land's summary judgment filings, it is reasonable to infer that surface flowlines pose hazards and limit the use of the surface of the leased land in ways that flowlines buried at least three feet below the surface do not. For example, Emerald Land's Opposition describes damage to the leased land caused by flowlines and includes images of flowline debris, but this evidence appears to be damage and debris from *surface* flowlines.[40] Emerald Land does not point to any damage that can be specifically traced to buried flowlines. In sum, Chevron's concession on removing surface flowlines is not inconsistent with its position that, under *Castex*, it is not

---

[37] *Id.*
[38] ECF No. 264 at 4.
[39] 893 So. 2d. at 800.
[40] ECF No. 264 at 7-8.

required to remove flowlines buried at least three feet below the surface pursuant to the Mineral Leases.

Emerald Land next argues that if Chevron removes any equipment from the leased land (such as surface flowlines) it must remove *all* equipment from the land, including buried flowlines. Emerald Land bases its argument on a provision in the Mineral Leases that states:

> Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by lessee on said land, including the right to draw and remove all casing.[41]

Emerald Land argues that the term "all" means that Chevron cannot pick and choose which equipment to remove but must remove all equipment. The Court disagrees. This language grants Chevron the right to remove its equipment and fixtures from the leased land. In this context, the plain and ordinary meaning of the term "all" is that Chevron's removal right is not limited to certain equipment or fixtures but encompasses "all" of the equipment and fixtures on the leased land. Emerald Land, however, reads this term as creating a limitation on Chevron's right to remove—that Chevron can remove all *but only all* of the equipment and fixtures from the leased property. Accordingly, Emerald Land is essentially reading an additional requirement into the lease provision granting Chevron the right to remove property. The plain meaning of this granting language simply does not limit Chevron's right to remove equipment and fixtures in the way Emerald Land argues.

Finally, Emerald Land argues that it is entitled to recover the cost of removing all flowlines (including buried flowlines) based on the damages provision in the Mineral Leases. Specifically, these leases provide that:

---

[41] ECF Doc. 177, Ex. A at pp. 85–88, referring to ¶ 13 of exhibits 3, 4, and 5 attached thereto. (30(b)(6) Deposition of Emerald Land Corporation)

> Lessee shall *pay all damages* caused by its operations hereunder to the land, buildings and improvements presently existing, and crops now or hereafter planted.[42]

Emerald Land contends that the flowlines on the leased property have damaged the land by creating navigation hazards,[43] that leaks from flowlines are contaminating the property,[44] and that flowlines protruding from the surface are limiting Emerald Land's ability to enter into leases or otherwise use the land.[45] Under *Castex*, Emerald Land does not have a private claim (whether as damages or specific performance) for the removal of buried flowlines. As with the dredged canals in *Castex*, Emerald Land (or its predecessor) consented to the installation of buried flowlines in the Mineral Lease and (like the canals in *Castex*) the mere presence of these buried flowlines does not amount to "damages" in the sense of triggering the damages provision of the Mineral Lease or a claim under the Mineral Code. On the other hand, even under *Castex*, Emerald Land could assert private claims under the Mineral Leases and the Mineral Code with respect to buried flowlines if, for example, those flowlines leaked fluids that contaminated the leased property.[46]

---

[42] *Id.* (emphasis added).
[43] ECF No. 264, Ex. 6, Rule 30(b)(6) Depo. of Emerald, pp. 84: 5 – 12, 214: 5 – 8.
[44] ECF No. 264, Ex. 7, Depo. of Rudy Sparks, at 71:10 – 18.
[45] *Id.* at 175: 18 – 176: 5; 177: 18 – 24.
[46] *Marin*, 48 So. 3d. at 259-60. According to the court in *Marin*:

> In our view, the duty to remediate oilfield contamination exists under the prudent operator standard of the Mineral Code by virtue of our holding in *Castex*, and it certainly exists under the Civil Code. The holding in *Castex* merely recognized that in absence of unreasonableness or excessiveness, the lessee has the duty to restore the surface minus normal wear and tear. Where the lessee has operated unreasonably or excessively, as in this case, the lessee has additional obligations, e.g., the obligation to correct the damage due to the unreasonable or excessive operations However, that does not necessarily mean that the lessee has a duty to restore the land to its pre-lease condition, particularly where, unlike dredged canals, subsurface contamination is not overt and cannot be considered "wear and tear."
>
> ...
>
> The damage caused by Exxon's unreasonable operations was the contamination of the soil, and it is clear plaintiffs did not consent to this contamination. Therefore, Exxon's additional restoration duty is the duty to correct the contamination.

*Id.* (citations omitted).

Chevron contends that, even if Emerald Land retains a private claim for damages caused by buried flowlines, it has come forward with no evidence to support a damage claim with respect to buried flowlines. The Court agrees. The evidence cited by Emerald Land appears to reflect damage caused largely by *surface* flowlines, which are not the subject of the present motion. In three instances, Emerald Land refers to "buried" flow lines:

- "Michael Fogarty, former President of Emerald, testified that 'there were a couple of times when there was some gas bubbling up, you know, out of a flowline' that was *buried* under the Property's surface."[47]
- "Mr. Cantrell took photographs of 'flowlines sticking up that you got to watch for,' and explained that the buried flowlines presented navigational hazards to boaters, hunters and other recreational users."[48]
- "[B]uried flowlines often do not actually remain buried—they migrate to the surface and cause serious navigational hazards."[49]

But these three statements do not create a triable issue with respect to buried flowlines. The statement attributed to Fogarty is not supported by his deposition testimony. In his deposition, Fogarty does refer to "gas bubbling up, you know, out of a flowline," but he never identifies whether the flowline was a surface flowline (on or less than three feet below the surface) or a buried flowline—he merely refers to a "flowline." Moreover, the statement attributed to Cantrell appears to refer to *surface* flowlines causing navigational hazards. Finally, with respect to the "migration" of buried flowlines, Emerald Land points to no evidence showing that flowlines buried at least three below the surface have (or are likely to) "migrate" to the surface. At most the evidence presented by Emerald Land is speculative and conclusory, and is not sufficient to create a triable issue on a damages claim with respect to buried flowlines.

---

[47] ECF No. 264 at 9.
[48] *Id.*
[49] *Id.* at 6.

In sum, Chevron's Motion for Partial Summary Judgment is GRANTED and Emerald Land's private claims against Chevron are DISMISSED to the extent that they are based on the removal of buried flowlines—flowlines buried at least three feet under the surface of the leased land.[50] In all other respects, the motion is DENIED.

THUS DONE in Chambers on this 4th day of August, 2021.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[50] Chevron's Motion for Partial Summary Judgment as well as this Court's ruling on that motion does not address any claim that Emerald Land may have with respect to decommissioning the buried flowlines as opposed to physically removing the flowlines. For example, Chevron points out that, as part of the plugging and abandonment process that certain actions would be taken to flush and otherwise decommission the buried flowlines to prevent any oilfield contamination. The Court's ruling takes no position on any claims that may arise from the failure to undertake this decommissioning process.